

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

F I L E D
UNITED STATES DISTRICT COURT
NEW MEXICO

APR 2 0 2001

CLERK

ELIZABETH PERRY,
    Plaintiff,

vs.                        No. CV 96-1488 JHG/WWD

JUDY WOODWARD, INDIVIDUALLY
AND AS THE BERNALILLO COUNTY
CLERK AND THE BOARD OF COUNTY
COMMISSIONERS OF THE COUNTY
OF BERNALILLO,
    Defendants.

## PLAINTIFF'S PROPOSED POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW the Plaintiff, ELIZABETH PERRY, by and through her attorney, Steven

K. Sanders and submits the following proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

1.    This Court has jurisdiction over the parties and the subject matter.

2.    Plaintiff is a female whose race or ethnicity is Hispanic (Exhibits 1 and 2) and
whose national origin is, in part, Mexican. Defendant Judy Woodward is an individual whose race
is White. Defendant Board of County Commissioners of the County of Bernalillo (herein
Bernalillo County) is a political subdivision of the State of New Mexico. (Testimony of Perry and
Woodward).

3.    At all times material hereto, Defendant Judy Woodward was the duly elected
County Clerk of Bernalillo County and was empowered to hire and fire Plaintiff. At all times
material hereto, Defendant Judy Woodward acted within the course and scope of her duties and
powers as County Clerk of Bernalillo County. Defendant Woodward was the final authority
within the County of Bernalillo with final power to hire and fire Plaintiff. (Testimony of Perry and
Woodward, exhibits 1, 3, 4, and 9).



4.     In February, 1993, Plaintiff was employed by the Secretary of State's Office in Santa Fe, New Mexico as the Deputy Secretary of State. Woodward recruited Perry to work as an employee for Defendant Board of County Commissioners of the County of Bernalillo (herein "Bernalillo County" or "County") in the Bernalillo County Clerk's office as one of two equal Deputy Clerks who would work under Judy Woodward. Perry was to be the Deputy of the Election Bureau. The other Deputy, Gail Short was the Deputy of the Recording and Filing Bureau. (Woodward and Perry Testimony).

5.     Perry was promised by Woodward that her position with the County Clerk's office would last as long as Judy Woodward was the County Clerk. Woodward finished her two terms on January 1, 2001. (Testimony of Liz Perry, Earl Perry and Woodward).

6.     From March 1, 1993 until February 25, 1994, Plaintiff was an employee (as defined by 28-1-2(E) N.M.S.A. 1978 (2000 Repl.)) of Defendant Bernalillo County. (Exhibit 1) Plaintiff as an employee of Bernalillo County had, pursuant to 42 U.S.C. § 1981, the right "to make and enforce contracts... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens..." (Plaintiff's Exhibit 1, 3, 4 and 5 and Perry and Woodward testimony).

7.     Plaintiff as an employee of Defendant Bernalillo County had a contract of employment protected by 42 U.S.C. § 1981 entitling her to wages, compensation and employee benefits. The benefits included a retirement plan, medical insurance, sick leave, annual leave and personal leave for services rendered. (Plaintiff's Exhibit 1, 3, 4 and 5 and Perry testimony and Defendants' Answers to Interrogatories).

8.     Defendant Bernalillo County is an employer (as defined by 28-1-2(B) N.M.S.A. 1978 (2000 Repl.)) employing four or more persons. (Vigil and Perry testimony and exhibit 17).

9.      Plaintiff was fired or terminated by Defendant Bernalillo County acting through Defendant Judy Woodward on Saturday, the 26th day of February, 1994, effective February 25, 1994. (Plaintiff's Exhibit 1, 3, 4 and 5 and Perry and Woodward testimony).

10.     Plaintiff's prospective termination was discussed by Judy Woodward, the County Clerk of Bernalillo County, with another employee in the Clerk's Office, Irene Serna, approximately one week prior to Plaintiff being notified of her termination. (Testimony of Woodward and Serna).

11.     In December, 1993 or January of 1994, Plaintiff learned from Jamie Diaz, the Manager of the Bureau of Elections for Bernalillo County, that Tina Gallegos, a former Deputy of the County Clerk of Valencia County, was working in Albuquerque.  Plaintiff advised Woodward that Tina Gallegos would make a good candidate for a position in the Bernalillo County Clerk's Bureau of Elections Office.  Plaintiff and Woodward agreed that it was "a stroke of luck" to find Tina Gallegos because she would not need any training to work in the Elections Bureau.  With Woodward's knowledge and permission, Plaintiff and Jamie Diaz had lunch with Gallegos and encouraged her to apply for the position with County Personnel when it was posted.  (Perry testimony).

12.     Ms. Gallegos thereafter did apply for the position when it came open by filing an application with County Personnel.  After being interviewed (along with two other candidates), Ms. Gallegos was hired by Plaintiff with the recommendation of Jamie Diaz in early January 1994 to work in the Bureau of Elections.  Tina Gallegos is an Hispanic woman.  Judy Woodward, after being informed of the hiring of Tina Gallegos, told both Plaintiff and Jamie Diaz a supervisor in the Bureau of Elections, not to hire any more Hispanics.  (Testimony of Perry, Diaz and Rachel Martinez, pp. 26-27, llns. 23-25 and 1-7).

13.    Woodward was not candid with the Court when she testified that because of the hiring of Ms. Gallegos she did not tell either Perry or Diaz that she wanted more balance in the office in terms of race and ethnicity (Woodward testimony, Tr. 84, llns.12-16).  Woodward was impeached by her earlier testimony before the New Mexico Human Rights Commission where she testified that after the Gallegos hiring she told Perry and Diaz that, "...I simply stated that I hoped we would aim for more balance in the office –a reflection of the population." (Tr. 84-85, llns 21-25 and 1-13).

14.    On or about January 20, 1994, during the County's mid-year budget meeting, which was attended by Woodward, Perry, Diaz, County Manager Juan Vigil, Assistant Finance Director Mary Herrera, Jeanne Myers and others, Defendant Judy Woodward threw a piece of paper to Liz Perry and said, "Why do I have so many Mexicans working for me?" (Testimony of Mary Herrera, p. 4 llns 16-21).  "Liz, I don't want you to hire any more Hispanics in the Bureau of Elections."  Judy Woodward then turned to Jeanne Myers, an Anglo employee of the Clerk's office and said,  "And you Jeanne with your blue eyes and  blonde hair, you stick out like a sore thumb".  (Perry, Diaz and Myers testimony).

15.    Woodward admits that she wanted "more variety in balancing the makeup of our staff to reflect more accurately the diversity of Bernalillo County." (Exhibit 13 and Tr. 79, llns 9-14).

16.    Later that same day, Judy Woodward went to Charles Fearing, Human Resources Director for the County and said to Fearing in the presence of Mary Herrera, "Why do I have so many Mexicans working for me?  I can't believe I have so many Mexicans working for me." (Tr. 5, llns. 12-25): Mary Herrera immediately went to Fearing, the County Manager and the County

Attorney to notify them of the statements being made by Woodward. (Herrera testimony, Tr. 6, llns 9-14).

17.    Still later that same day, Woodward told Plaintiff that she was not to even interview any Hispanic candidates for any position that was open in the Bureau of Elections and that Woodward would be present for all interviews of all employees thereafter for the Bureau of Elections. (Perry Testimony).

18.    Judy Woodward has not attended interviews with the Deputy Clerk who replaced Plaintiff, Irene Serna, who makes her own decisions on who to hire and simply notifies Woodward of management hires so Woodward will know who the people are in the office. (Serna testimony).

19.    During the trial of this matter, Woodward testified on direct examination that she believed that Perry was only hiring Hispanics, stating "Q. Now, did Ms. Perry – did it appear to you in her hiring practices that she seemed to just hire Hispanics, despite the fact that other races applied, in your observation? A. I believe that was true, yes. ... Q. Why did you believe that Ms. Perry was not attempting to hire anybody from other races besides the Hispanic race? A. I concluded only from the people that came in.". (Tr. 34, llns. 11-15, p. 35, llns. 5-9). Under cross examination, Woodward denied her testimony on direct stating: "Q. All right, fine. I had understood you to say something to the effect that you were concerned about Ms. Perry's hiring practices because she was only hiring Hispanics. Did I get that wrong? A. I think your reading is wrong. I did not state that." (Woodward testimony, Tr. 77-78, llns. 24-25 and 1-4). Nevertheless, it is clear that Woodward was fixated upon the number of Hispanics working in the Bureau of Elections.

20.    In her response to the accusation of discrimination, (Plaintiff's exhibit 13), Woodward states that "**The Bureau of Elections**, at that time, had 16 employees **and only one was Anglo.**"  Woodward was clearly upset about the racial make-up in the Bureau of Elections and testified that she was "...specifically talking about Anglos when you were talking about the applicants for the County Clerk's office during that meeting;...(the January 20, 1994 mid-year budget meeting).. (Woodward testimony, Tr. 75, llns. 18-22 and Exhibit 13).

21.    Woodward admitted on cross examination that you have to hire from the list provided by the County Personnel Department.  (Tr. 37, llns. 6-7, Tr. 78, llns. 5-10).

22.    On February 7, 1994, Woodward was in fact present for some subsequent interviews for a position (Clerical Specialist III) in the Bureau of Elections which was conducted by Plaintiff. (Woodward testimony, Tr. 72, llns. 22-24).

23.    However, Woodward again was not truthful when she testified on direct that, "I walked into the main office of Elections, and this African-American woman was sitting, waiting to be interviewed, and I sat in on that interview." (Woodward testimony, Tr. 35-36, llns, 23-25 and 1-4), as this testimony is directly contradicted by Woodward's signed statement to the EEOC and New Mexico Human Rights Administration stating, "I asked to see the list of candidates for interview and suggested we include a candidate noted as an African-American.  The interview went well.  A job was offered, but Ms. Perry later told me that the woman 'failed the drug test.'" (Exhibit 13 and Tr. 80-81, llns. 22-25 and 1-2).  Furthermore, according to Woodward, the list of candidates does not identify the candidates race.   (Tr. 79, llns. 21-23).

24.    When Plaintiff recommended hiring an African American candidate, Woodward tried to discourage the hiring stating: "Are you sure you want to hire a Black person..." reminding Plaintiff of an EEOC discrimination complaint filed and then pending against Woodward by

another African American worker (Janice Satcher) who was not interviewed for a promotion within the Clerk's office. Plaintiff, nevertheless, offered the position to the African American candidate, but she never completed the physical or drug test for the position and hence did not start work for the County. (Perry and Woodward testimony, Tr. 36, llns. 3-4), Exhibit 11).

25.     Woodward's testimony during the trial was that she had agreed that a job offer should be made to the African-American woman[1] was not credible (Tr. 36, llns. 16-21 and Exhibit 13 ("The interview went well."), Tr. 80, llns 22-25 and 81, llns. 1-2) because this testimony directly conflicts with Woodward's earlier testimony before the New Mexico Human Rights Commission Hearing concerning the hiring in which she stated that, "She already knew that before we –before we interviewed the – the young Black woman, and my sense again, I wanted diversity in the office, that included Blacks. The—the—uh, my comfort with hiring this woman was – was clear. **I wasn't impressed with her**." (Tr. 81-82, llns 23-25 and 1-6).

26.     In mid February 1994 (because the African American candidate did not qualify for the position since she did not complete the physical or drug test), Plaintiff, in contravention of the order given by Judy Woodward not to hire any Hispanics, hired by transfer from the Recording and Filing Bureau, into the Bureau of Elections, Arlene Martinez, a Hispanic woman. (Perry, Diaz and Arlene Martinez testimony)

27.     Prior to her transfer, Arlene Martinez had previous experience working in the Elections Bureau and was qualified for the position. Perry told Arlene Martinez about the opening in the Election Bureau. "Liz Perry told me she had an opening. She knew I was going through a lot of stress on that side. So I went and I applied for it. I got an interview, and I got

---

[1] "I think Liz and I both agreed that a job offer should be made to her." Tr. 36, llns. 16-17.

hired. I was interviewed by Jamie Diaz and Liz Perry."   (Arlene Martinez, p. 7, lln. 14-19 and Perry testimony)

28.     When Judy Woodward asked Plaintiff whom she had hired and was told it was Arlene Martinez, Judy Woodward turned red faced and walked away from Plaintiff without saying a word.  One week later, Judy Woodward told Irene Serna that she was firing Plaintiff and one week thereafter Judy Woodward did in fact fire Perry on February 26, 1994.  (Exhibits 1, 3, 4, and 5 and Perry, Serna and Woodward testimony).

29.     Woodward was not truthful before this Court, when Woodward testified that she was the one that had hired Arlene Martinez into the Bureau of Elections, not Perry.  Woodward's testimony before this Court was that, "She {Perry} did not hire her.  I started talking to Arlene Martinez at her request before Christmas of '93 because her job had changed." (Tr. 47, llns 5-10, Tr. 69, llns 1-25 and Tr. 70, llns. 1-25).  According to Arlene Martinez, Woodward never talked to Arlene Martinez about the transfer nor helped her get the transfer.  (Woodward, Arlene Martinez, pp. 8-9 llns 16-25 and Perry testimony).   Furthermore, Woodward herself testified before the Human Rights Commission that she had nothing to do with the transfer into the Bureau of Elections[2]. (Tr. 70, llns 12-17).

30.     Woodward's lack of candor about who it was that was responsible for the transfer of Arlene Martinez is strong evidence that a motivating reason[3] for the termination of Perry's

---

[2] And do you recall being asked at page 78 concerning Arlene Martinez at line 21:  "After—you didn't transfer her into that position, Ms. Perry did?"  That was my question.  "ANSWER: No, I had nothing to do with it.  Ms. Perry did that."  (Tr. 70, llns. 11-25).

[3] See, *Elmore v. Capstan, Inc.*, 58 F.3d 525, (C.A.10 (Kan.) 1995)("To do so **the employee need neither prove his employer's proffered reasons were false, nor that a discriminatory factor was the "sole motivating factor in the employment decision."**   See  James v. Sears, Roebuck & Co., Inc., 21 F.3d 989, 992 (10th Cir.1994) (citations omitted) (applying the McDonnell Douglas analysis in a constructive discharge action brought under the Age Discrimination in Employment Act,  29 U.S.C. § 621).  **Instead, the employee must prove only that a discriminatory factor was "also a reason for the employer's decision"** and that it was "the factor that made a difference."  Id.")  Excerpt from page 58 F.3d 530.

employment was retaliation for Plaintiff's hiring or transfer of Arlene Martinez into the Bureau of Elections, simply because Arlene Martinez is a person whose race is Hispanic.

31.   Rachel Martinez testified that Perry was in trouble for hiring an Hispanic. **"I know that one time she got in trouble. I know that she told Liz off. I know she did, because we could hear it. It was, again, for hiring Hispanics.** And I was sitting there in this office—I don't know if you've seen it—I was sitting right there. There's a computer. And she said something about Liz hiring Hispanics. The next thing I knew, the door was closed. So what else went on? I don't know." (Rachel Martinez testimony p. 26 llns. 21-25 and 27 llns 1-3).

32.   In February 1994, prior to the hiring of Arlene Martinez, Woodward registered Perry for a twelve (12) week course in personnel management at the University of New Mexico Department of Continuing Education. (Perry testimony and Woodward testimony, Tr. 114-115, llns. 24-25 and 1-2). It is not logical to believe that Woodward would have registered Perry for this twelve (12) week course at taxpayer expense in February 1994 if Woodward had in fact previously decided to terminate Perry on or about January 6, 1994 (the date of the second Commission meeting concerning the voting machine purchase) as testified to by Woodward during the trial. (Tr. 42, llns. 14-20).

33.   Woodward's trial testimony that one of the reasons that she terminated Perry was for campaigning for Rebecca Vigil-Giron is not credible since she previously testified in deposition that any campaigning for Vigil-Giron was not a factor in the termination. (Woodward testimony, Tr. 117-118, llns 13-25 and 1-4).

34.   The hiring or transfer of Arlene Martinez, (an Hispanic woman) is a protected activity that Plaintiff engaged in under 42 U.S.C. § 1981.

35.     The hiring or transfer of Arlene Martinez, (an Hispanic woman) by Perry is a form of opposition to an unlawful discriminatory practice protected under the New Mexico Human Rights Act, 28-1-7 I N.M.S.A. (2000 Repl. Pamp.).

36.     The New Mexico Human Rights Act states in part that "It is an unlawful discriminatory practice for:...I. Any person or employer to: (1) aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or to attempt to do so; (2) **engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice...;**"

37.     By terminating Perry for the hiring or transfer of Arlene Martinez, Woodward was engaging in a form of reprisal or discrimination against Perry because Perry had opposed an unlawful discriminatory practice.

38.     When Plaintiff was interviewed by Judy Woodward, Plaintiff was asked by Woodward what was her race. Plaintiff replied that she was both Hispanic and Mexican because her mother's family was from Mexico but she was born in the United States. After Perry was hired, Judy Woodward told Pat Esplin and others that she (Judy Woodward) had hired a Hispanic Deputy Clerk but that Plaintiff did not look like a person of Hispanic origin. (Woodward, Rachel Martinez p. 7, 8 llns. 21-25, 1-6 and Esplin p. 93 llns. 11-15 testimony).

39.     Woodward told Diaz that Perry could not sue for discrimination because she had replaced Perry with an Hispanic, Irene Serna. (Diaz testimony).

40.     Woodward told Diaz and Espalin that she could not be sued for discrimination in the case of Janice Satcher (the African American woman who had filed the EEOC complaint) because Woodward had replaced her with another African American woman: "They can't accuse

me of being a racist because I have a Black working for me." (Espalin testimony p. 104 llns 1-4 and Diaz testimony).

41.    The replacement of Satcher with an African American woman, Perry with an Hispanic woman and Diaz with an Hispanic male was a tactic that Defendant Woodward used to defend discrimination claims.

42.    In the opinion of Rachel Martinez Judy Woodward, "is a racist." (p. 34-35 llns 9-25, 1-4) Examples of her racist attitudes follow in findings 43-57.

43.    During the first staff meeting held by Judy Woodward in January of 1993 after taking office as Clerk Woodward announced that "Hispanics" needed more education. Subsequently, Mrs. Woodward began passing out educational announcements out to Hispanic members of the Clerk's Office, but not Anglo members of the office. (Diaz, Chavez p. 119 llns. 14-21, Childers, Cortez, and Espalin p. 95-96 llns. 19-21, 1-7 testimony).

44.    Woodward told Jamie Diaz that she was surprised that he had not been shot since he was a Hispanic stud. (Diaz testimony).

45.    Defendant Judy Woodward told Rick Chavez that "Hispanic's were hot blooded people"; that he was a "hot-blooded Hispanic"; and that he had a good command of English which was her way of denigrating Hispanic people. (Chavez testimony p. 123 llns. 16-18).

46.    Defendant Judy Woodward told Perry and Julie Childers, that she would not interview an African American (Janice Satcher) applicant for a position at the Clerk's office because the person was "not in her class." (Perry and Childers' testimony)

47.    Defendant Judy Woodward asked Julie Childers "Do you know why I don't like Hispanics?  Its because my husband left me for one of you hot-blooded Hispanics". (Childers testimony).

48.     Woodward stereotyped African Americans by telling Perry, Childers and Rachel Martinez that Blacks have "big rear ends" and smell and were more endowed than non-African Americans. (Perry, Childers and Rachel Martinez p. 9, llns. 11-20 testimony).

49.     Judy Woodward referred to Donna Lopez as a "dirty Mexican" and as an "ignorant person". (Lopez testimony).

50.     Donna Lopez after being called a "dirty Mexican" went to Viola Cortez, a union steward crying about the comment.  Judy Woodward also said that you "Hispanic's don't have enough education". (Testimony of Cortez).

51.     Woodward told Larry Dominguez, an employee of the Secretary of State's office that she had a lot of "dumb" Hispanics working for her in the Bureau of Elections. (Dominguez testimony).

52.     Woodward told Mary Herrera, an Hispanic and the current County Clerk of Bernalillo County, that she wanted to hire her because the Democratic Party wanted her to hire an Hispanic.  (Tr. 7, llns 5-17). Woodward also made racist remarks about Native Americans to Herrera  (Herrera testimony, Tr. 7, llns 18-25 and 1-6) and  Rachel Martinez deposition, pp. 7-8)

53.     Woodward told Rachel Martinez that the Democratic party wanted her to hire an Hispanic for Deputy and was upset with her for hiring an Anglo "lesbian" (Rachel Martinez testimony. Pp. 7-8 llns. 14-25, 1-6).

54.     Woodward told Rachel Martinez that "You Hispanics don't know how to take constructive criticism.  You guys go up to a certain level, and that gets you through life, that's fine." Woodward also told Rachel that "There's a lot of old ladies there, and, you know, they're Hispanics, they're set in their own ways.  They don't want to learn the new things." And I looked at her, and she said, "But I'll get rid of them."... "I know I can't go in there and start firing

everybody, but I can make it so miserable that they will leave, one at a time." (Rachel Martinez testimony, pp. 10-11 llns. 17-22, 2-11).

55.    Woodward told Rachel Martinez that "Rachel, you Hispanics are so hot tempered…"(Rachel Martinez testimony, p. 19 llns. 19-24)

56.    Woodward told Dolores Waller, former County Clerk of Bernalillo County that any student from Highlands University with a 4.0 average was not a good student. Waller who is Hispanic interpreted this statement as a racist statement since the majority of the students at Highlands University are Hispanic. (Waller testimony).

57.    Woodward told Josie Byers that her niece needed to speak good English for an interview. Byers who is Hispanic interpreted this statement as a racist statement because she and her niece are Hispanic and Woodward had no idea how proficient the niece was in English. (Byers testimony).

58.    Plaintiff's termination by Defendants was motivated by retaliation against Plaintiff by Judy Woodward because Plaintiff engaged in protected activity by opposing an unlawful discriminatory practice by hiring a Hispanic person in violation of the orders given to her by Defendant Woodward. (Perry testimony).

59.    Plaintiff's termination was not explained in any way in Defendant Woodward's Response to the Accusation of Discrimination by E.E. "Liz Perry" dated July 6, 1994 and signed by Defendant Woodward. (Exhibit 13)

60.    Defendants violated 28-1-7(A) N.M.S.A. 1978 (2000 Repl.) because Defendants discriminated in the terms, conditions or privileges of employment against Plaintiff based upon Plaintiff's race or national origin or in retaliation against Plaintiff because she hired a Hispanic employee in violation of the direct order of Judy Woodward and thus opposed an unlawful

discriminatory practice under the law as prohibited by 28-1-7 I. (1) and (2) N.M.S.A. 1978 (2000 Repl.) and as prohibited by 42 U.S.C. § 1981.

61.    Plaintiff was otherwise qualified for her position and was never written-up nor disciplined in any way by Judy Woodward. (Perry testimony).  Woodward's testimony that she gave Plaintiff a letter expressing her displeasure with Perry's performance in connection with making a recommendation for the number of voting machines in December 1993 is not credible since no such letter was ever produced nor identified in the Rule 26 disclosures nor in Defendants' answers to interrogatories nor was the letter offered into evidence at trial by Defendants. (Perry's testimony, Exhibit 27)

62.    Under 42 U.S.C. 1981 and under 28-1-7 N.M.S.A. 1978 (2000 Repl.), it is an unlawful discriminatory practice to order a subordinate not to interview and not to hire individuals of a particular race.

63.    Plaintiff on June 9, 1994, timely filed a Complaint with the New Mexico Human Rights Commission alleging that Defendants engaged in a discriminatory practice based upon the race (Hispanic) and National Origin of Plaintiff.  Plaintiff's complaint sufficiently alleged retaliation to put Defendants' on notice of a claim of retaliation because the Complaint states that **"On February 26, 1994 I was discharged from the position of Deputy County Clerk because I hired a Hispanic person after being told not to."**  The complaint was formally amended on October 20, 1994, to add retaliation as an additional charge.  Additionally, Plaintiff jointly filed her complaint on June 9, 1994, with both the EEOC and New Mexico Human Rights Commission and Plaintiff therefore had 300 days to file for retaliation from February 26, 1994.  (Exhibits 7 and 23).

64.     Defendant engaged in an unlawful discriminatory practice in violation of the Rules and Regulations of the Human Rights Division, Section XII A by using hiring criteria which set up barriers to employment or promotion for qualified persons without a strict foundation in occupational necessity. (Exhibit 24).

65.     At the time of her discharge by Judy Woodward, Plaintiff was earring 40,250.08 per year or $19.351 per hour. (Perry testimony and exhibits 1, 3, 4).

66.     Both Deputy Clerk's salaries were raised to $43,000.00 per year starting July 1, 1995. It is reasonable to find that Plaintiff would have been raised to $43,000.00 had she not been retaliated against and had remained employed. (Serna testimony and exhibit 17).

67.     At the time of her discharge by Judy Woodward, Defendant was entitled to certain employee benefits including health insurance, retirement benefits, two personal holidays per year (2 days x 8 hours per day), vacation pay at the rate of 104 hours per year and sick leave at the rate of 104 hours per year for which Plaintiff is entitled to compensation until she was able to secure a full time equivalent position on January 1, 1999. (Perry testimony and exhibit 9).

68.     Plaintiff paid for her own health insurance from the time of her termination on February 25, 1994 until March, 1999, for a total of sixty (60) months. Plaintiff paid $122.87 for the first eighteen months and thereafter, Plaintiff paid at least $181.66 until March 1, 1999 to secure equivalent medical insurance coverage after her termination by Defendants. Plaintiff thus lost $2,211.66 ($122.87 x 18) for the first eighteen months after termination for medical coverage. Plaintiff lost an additional $7,629.72 ($181.66 x 42 months) for medical coverage until March 1, 1999. Plaintiff's total payments for health insurance coverage since her termination equals $9,841.38. (Perry testimony and Exhibit 10).    The County paid 52% of the health

insurance benefits for its employees and Plaintiff is thus entitled to 52% of $9,841.38 as damages or **$5,117.52.**

69.     From the time of Plaintiff's termination by Judy Woodward, until January 1, 1999, Plaintiff was not able to secure comparable employment. Plaintiff was not even interviewed for any positions other than a part-time position as a tour guide for the legislature (Perry testimony).

70.     Plaintiff was making $40,250.08 per year ($19.351 per hour) when employed by the County. The County additionally paid 19.1% to Public Employees Retirement Association, on Plaintiff's behalf or an additional $7,651.54 per year for retirement benefits. Additionally, Plaintiff was entitled to 104 hours annually for vacation and two personal holidays (an additional 16 hours) or the equivalent employment benefit of $2,322.12 based upon 120 hours of vacation or leave @ $19.351 per hour. Plaintiff thus was earning $50,223.74 per year including employment benefits of retirement, vacation and personal leave. (Perry Testimony and Defendants' Answers to Interrogatories).

71.     Plaintiff as a result of the unlawful discriminatory practice of Defendants lost the annual value of her Public Employees Retirement Act (P.E.R.A.) benefits which value is equivalent to the County's contributions to the fund on behalf of Plaintiff or $7,651.54 per year. (Perry testimony, Defendant's answers to interrogatories).

72.     Plaintiff was unable to secure comparable employment in 1994 despite her reasonable efforts to find a comparable position. Plaintiff as a result of the unlawful discriminatory practice of Defendants is thus entitled to ten months of $50,223.74 per year for 1994 or **$41,853.12.** (Perry testimony and Exhibit 9).

73.     Plaintiff as a result of the unlawful discriminatory practice of Defendants lost one

personal day earned prior to the time she was fired and two personal days for each year since termination. Each personal day is worth the Plaintiff's wages or $154.81 per day and Plaintiff as a result of the unlawful discriminatory practices of Defendants is entitled to that loss of **$154.81** for 1994. (Perry testimony and Exhibit 9).

74.    Plaintiff as a result of the unlawful discriminatory practices of Defendants lost the value of her sick leave benefits which value is equivalent to the Defendant's sick leave benefit of 104 hours per year times for four years and 10 months plus the amount of sick leave that Plaintiff had accumulated upon her termination or 76 hours which equals 496.67 hours minus 250 hours = 246.67 times 2 hours of sick leave divided by 3 hours of annual leave equals 164 hours times the hourly rate of compensation for Plaintiff or $19.351 per hour which equals **$3,182.16** which Plaintiff could have sold to the County at the end of her employment with the Clerk's office. (Perry testimony and Exhibit 9).

75.    Plaintiff was unable to secure comparable employment in 1995 despite her reasonable efforts to find a comparable position.    Plaintiff as a result of the unlawful discriminatory practice of Defendants is entitled to **$50,223.74** in lost wages for 1995. (Perry testimony and Exhibit 9).

76.    Plaintiff was unable to secure comparable employment in 1996 despite her reasonable efforts to find a comparable position.    Plaintiff as a result of the unlawful discriminatory practice of Defendants is entitled to $50,223.74 in lost wages.  However, both Deputy Clerk's were given a $.97 per hour raise in July, 1995 and Plaintiff is thus entitled to $2,017.60, (2080 hours per year x $0.97 per hour) additional damages for lost wages for a total loss of **$52,241.34** in lost wages for 1996. (Perry testimony and Exhibit 17).

77.     Plaintiff was unable to secure comparable employment in 1997 despite her reasonable efforts to find a comparable position.  Plaintiff as a result of the unlawful discriminatory practice of Defendants is entitled to $50,223.74 in lost wages. However, both Deputy Clerk's were given a $.97 per hour raise in July, 1995 and Plaintiff is thus entitled to $2,017.60, (2080 hours per year x $0.97 per hour) additional damages for lost wages for a total loss of **$52,241.34** in lost wages for 1997. (Perry testimony and Exhibit 17).

78.     Plaintiff was unable to secure comparable employment in 1998 despite her reasonable efforts to find a comparable position.  Plaintiff a result of the unlawful discriminatory practice of Defendants is entitled to $50,223.74 in lost wages.  However, both Deputy Clerk's were given a $.97 per hour raise in July, 1995 and Plaintiff is thus entitled to $2,017.60 additional damages for lost wages. (Perry testimony and Exhibit 17).  Further, Plaintiff would be entitled to an additional 31.2 hours of vacation in 1998 for five years of employment which is an additional loss of $603.75 (31.2 hours times $19.351 per hour) for a total loss in 1995 of **$52,845.09.** (Perry testimony and Exhibit 9).

79.     In 1999 Plaintiff secured an equivalent position with the Secretary of State in Santa Fe, New Mexico. However, Plaintiff had to commute to Santa Fe, New Mexico from her home in Albuquerque, New Mexico which is 128 miles round trip for six months.  Plaintiff should be compensated for this at the rate of $0.31 per mile or $35.84 per day for six months or **$5,158.40** (26 weeks x 5 days per week x 128 miles per day x $0.31 per mile). (Perry testimony).

80.     Between 1994 and 1999, Plaintiff earned less than $8,000 as a tour guide in Santa Fe, New Mexico working for the legislature while it was in session, (60 days during odd numbered years and 30 days in even numbered years) which amount should be credited to Defendants herein. However, Plaintiff had to commute to Santa Fe, New Mexico to work from

Albuquerque, New Mexico, Plaintiff's residence, which should be reimbursed to Plaintiff at the rate of $35.84 per day for 120 days or $4,300.80. Defendant is thus entitled to an offset of **$3,699.00** for Plaintiff's earnings. (Perry testimony).

81.    Plaintiff has also lost four years and ten months of retirement benefits. Defendants should be ordered to pay into the PERA fund an amount equivalent to the amount that Plaintiff and County would have paid in to the fund for that period of time, plus any penalty or interest charged by PERA. In the alternative, Plaintiff will have to work an additional 4 years and 10 months to secure her retirement pay and Defendants should pay the value of that work or **$221,090.05** (4 years and 10 months times Plaintiff's current wages of $41,221.00), i.e., the amount Plaintiff is paid for working because the value of her time is equivalent to her current rate of pay. (Perry testimony).

82.    Plaintiff, as a result of the unlawful discriminatory practice of Defendants has been damaged by suffering emotional distress, pain, suffering, inconvenience, and mental anguish which should be compensated in the amount of **$125,000.00**. (Liz Perry and Earl Perry testimony).[4]

83.    Defendant, Judy Woodward engaged in a discriminatory practice of retaliation with malice or with reckless indifference to the federally protected rights of Plaintiff as secured by 42 U.S.C. 1981 and 1981a and is entitled to punitive damages in the amount of **$250,000.00** from Defendant Woodward. (Perry testimony).

84.    Plaintiff is entitled to interest on her backpay award at the rate of 5% per annum

---

[4] See *Dodoo v. Seagate Technology, Inc.*, 235 F.3d 522, (C.A.10 (Okla.) 2000), involving an ADEA claim for failure to promote and holding that an award of $125,000 was reasonable as follows: "Next Seagate disputes the jury's award of emotional distress damages. Dodoo testified that he has trouble sleeping and wakes up with his heart pounding, not knowing where he is. In addition, he testified that he worked very hard to position himself well in America after immigrating to this country, but has felt that he was not recognized for his efforts. After having worked for Seagate for 18 years, Dodoo feels it was too late for him to start his career over with another employer. Dodoo has sought the counsel of his wife, ministers and friends to deal with these issues. All of that evidence forms a sufficient basis to support the jury's award of emotional distress damages in the amount of $125,000. Excerpt from page 235 F.3d 532.
\\SERVER01\SERVER_D\wordprocessing\PERRY.LIZ\FINDINGSfederal.doc

from date of termination until date of judgment to be calculated with Plaintiff's costs' bill.[5]

85.    Plaintiff has been represented by attorneys for the proceedings herein and she is entitled to a reasonable attorney fee for those services.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. New Mexico Statute 28-1-7 A. N.M.S.A. 1978 reads in part as follows:

> It is an unlawful discriminatory practice for:
>
> A. **an employer**, unless based on a bona fide occupational qualification, to refuse to hire, **to discharge**, to promote or demote or **to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race,** age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition;
>
> \*\*\*
>
> I.    any person or employer to:
> (1) aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or to attempt to do so;
> (2) **engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice**...; (Emphasis added).

3. Plaintiff was subject to an unlawful discriminatory practice by her employer the County of Bernalillo because the County discharged Plaintiff or unlawfully discriminated in the "terms, conditions or privileges of employment against Plaintiff because Plaintiff opposed an unlawful discriminatory practice by hiring a person of Hispanic race or ethnicity.

4.    Defendants violated New Mexico equal employment opportunity values by using hiring criteria which set up barriers to employment or promotion of qualified persons without a strict foundation in occupational necessity. (Exhibit 24).

---

[5] See 42 U.S.C. § 1981A(B)(2).
\\SERVER01\SERVER_D\Wordprocessing\PERRY.LIZ\FINDINGSfederal.doc

20

5.      Plaintiff timely filed a Complaint with the New Mexico Human Rights Commission alleging that Defendant engaged in a discriminatory practice based upon the race (Hispanic) and National Origin of Plaintiff.   The complaint sufficiently alerted Defendants that Plaintiff was claiming retaliation for hiring an Hispanic individual.  The complaint was amended on October 20, 1994, to formally add retaliation as an additional charge.  This amendment related back to the original filing and was thus timely.   Additionally, the amendment was within 300 days of the termination and was timely for filing with the EEOC and Plaintiff jointly filed her complaint with the EEOC and New Mexico Human Rights Commission.

6.      Judy Woodward, the Clerk of Bernalillo County, did "aid, abet, incite, compel or coerce the doing of any unlawful discriminatory practice or to attempt to do so" by Defendant County in violation of 28-1-7 I. N.M.S.A.

7.      The Plaintiff has lost **$480.408.57** in lost wages and employment benefits and reimbursement for an additional working time of four years and 10 months to secure her retirement which Defendants should pay to Plaintiff.

8.      Plaintiff, as a result of the unlawful discriminatory practice of Defendants, has been damaged by suffering emotional distress, pain, suffering, inconvenience, and mental anguish which should be compensated in the amount of **$125,000.00**.

9.      Defendant Judy Woodward intentionally engaged in a discriminatory practice of retaliation with malice or with reckless indifference to the federally protected rights of Plaintiff as secured by 42 U.S.C. 1981 and is entitled to punitive damages in the amount of **$250,000.00** from Defendant Woodward.

10.     Plaintiff is entitled to interest on the backpay award at the rate of 10% per annum from date of termination until date of judgment to be calculated with Plaintiff's costs' bill.

11.   Plaintiff was represented by attorneys for the proceedings herein and she is entitled to a reasonable attorney fee for those services.   The claim for attorney fees should be submitted within thirty days of entry of these findings.

12.   Plaintiff is entitled to the costs of these proceedings.

Respectfully Submitted,

_Steven K Sanders_
STEVEN K. SANDERS
Attorney at Law
820 Second Street N.W.
Albuquerque, New Mexico 87102
(505) 243-7170

I hereby certify that a true and correct copy of the foregoing was mailed to opposing counsel of record Jonlyn Martinez, PO Box 1805, Albuquerque, New Mexico 87102 this 23rd day of April, 2001.

_Steven K Sanders_
STEVEN K. SANDERS

THE EXHIBITS ATTACHED TO THIS

PLEADING ARE TOO VOLUMINOUS TO

SCAN.  SAID EXHIBITS ARE ATTACHED

TO THE ORIGINAL PLEADING IN THE

CASE FILE WHICH IS LOCATED IN THE

RECORDS DEPARTMENT,  U.S.

DISTRICT COURT CLERK'S OFFICE.