IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELIZABETH PERRY,

       Plaintiff,

vs.                             No.  CIV  96 - 1488  JHG/WWD

JUDY WOODWARD, individually
and as the Bernalillo County Clerk
and the Board of County Commissioners
of the County of Bernalillo,

       Defendants.

**COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On April 9-11, 2001, the Court held a bench trial in this matter.  Pursuant to Fed.R.Civ.P. 52, the parties submitted Proposed Findings of Fact and Conclusions of Law.  The Court's Findings of Fact and Conclusions of Law are set out below.

**I.  Findings of Fact**

**A.  Background**

1.     Defendant Judy Woodward was the duly elected Bernalillo County Clerk from January of 1993 to December of 2000.

2.     As the Bernalillo County Clerk, Defendant Woodward was permitted to hire two deputies to serve as her personal staff.

3.     Deputies hired by an elected official are at-will employees and serve at the pleasure of the elected official, and are not subject to County pay regulations.

4.     Defendant Woodward hired Gayle Short to serve as one of her deputies.

5.    Defendant Woodward offered the other Deputy position to Mary Herrera, a female Hispanic.

6.    Mary Herrera decided not to accept the position of Deputy in Defendant Woodward's administration.

7.    During the legislative session in February of 1993, Defendant Woodward offered Plaintiff Perry the position of Deputy.

8.    At the time Defendant Woodward made Plaintiff Perry the job offer, Defendant Woodward knew Plaintiff Perry was Hispanic.

9.    Defendant Woodward assumed that because Plaintiff Perry worked in the Secretary of State's office she would be familiar with election procedures.

10.    Plaintiff Perry had no training or education which would qualify her for the position of Deputy of the Bureau of Elections in Defendant Woodward's administration.

11.    Plaintiff Perry's work history demonstrates that prior to receiving political appointments, Plaintiff Perry worked in clerical, secretarial and sales positions.

12.    Defendant Woodward offered to pay Plaintiff Perry a higher salary than the one she received from the Secretary of State's Office, and Plaintiff Perry accepted Defendant Woodward's job offer.

13.    Defendant Woodward paid Plaintiff Perry the same salary that she paid her Anglo Deputy, Gayle Short.

14.    In February, 1993, Woodward hired Perry to work as an employee for Defendant Board of County Commissioners of the County of Bernalillo (herein "Bernalillo

County" or "County") in the Bernalillo County Clerk's Office as one of two equal Deputy Clerks who would work under Judy Woodward.

15.   Perry was to be the Deputy of the Election Bureau.  The other Deputy, Gayle Short was the Deputy of the Recording and Filing Bureau.

16.   Plaintiff Perry understood that the position of Deputy was an at-will position.

17.   Plaintiff Perry had not worked extensively with elections at the Secretary of State's Office and therefore had no practical experience in that regard.

18.   Plaintiff Perry failed to learn the various job duties of her subordinates in the Bureau of Elections as Defendant Woodward had instructed her to do.  This made it impossible for the Plaintiff to properly supervise and evaluate the employees in the Bureau of Elections in the Clerk's Office.

19.   Plaintiff Perry did not learn the duties and responsibilities of the Recording and Filing department of the Clerk's Office as Defendant Woodward had instructed her to do.

20.   Plaintiff Perry spent most of her time, while employed as Defendant Woodward's Deputy, making personal telephone calls that were not related to her duties as Deputy of the Bureau of Elections.

21.   Plaintiff Perry had limited computer skills and showed no interest or aptitude for learning computer skills and did not take advantage of the computer classes and instruction offered by the County.

22.   During 1993, Plaintiff Perry spent the majority of her time in the Clerk's Office planning the Governor's Career Development Conference which had nothing to do

*-3-*

with her duties as Deputy of Bureau of Elections.

23.    Plaintiff Perry also instructed her assistant, Jeanne Myers to work on the Governor's Career Development Conference on County time.

24.    While at the Governor's Career Development Conference, Plaintiff Perry told individuals that Defendant Woodward was crazy and was an incompetent Clerk.

25.    Plaintiff Perry told the spouse of her personal assistant, Jeanne Myers, that Defendant Woodward was crazy and incompetent.

26.    During the fall of 1993, Defendant Woodward was informed and personally observed Plaintiff Perry utilizing the County telephone to campaign on behalf of a political candidate, Rebecca Vigil Giron, during business hours using County equipment.

27.    Defendant Woodward reprimanded Plaintiff Perry and told her not to campaign on County time from the Clerk's office.

28.    Defendant Woodward learned that Plaintiff Perry would complain about her and had made negative and derogatory comments regarding Defendant Woodward to various individuals.

29.    Plaintiff Perry spread derogatory and malicious gossip regarding political candidates and state officials, including her former boss, while she was employed as Defendant Woodward's Deputy.

30.    Plaintiff Perry did not get along with other supervisors employed by the Bernalillo County Clerk's Office.

31.    Plaintiff Perry failed to follow Defendant Woodward's instructions and directives.

32.   Defendant Woodward told Plaintiff Perry that she wanted to be included in the interviews of individuals applying for manager, supervisor or important positions within the Clerk's Office.

33.   Defendant Woodward stressed diversity in the Clerk's office to make sure that people of all races were given opportunities in the Clerk's Office.

34.   An opening existed in the Clerk's Office for an Absentee Voting Coordinator, a classified position.  This was an important position in the Clerk's office because the Absentee Voting Coordinator would handle early voting for the first time and would supervise other employees.

35.   Jaime Diaz, Plaintiff Perry's subordinate, informed Plaintiff Perry that Tina Gallegos, a woman Mr. Diaz knew, would be perfect for the Absentee Voting Coordinator position.

36.   Plaintiff Perry, through Jaime Diaz, contacted Tina Gallegos, informed her that the Absentee Voting Coordinator position was available in the Bureau of Elections of the Clerk's office.  Then, both Plaintiff Perry and Mr. Diaz took Ms. Gallegos to lunch to further discuss the position.

37.   Plaintiff Perry deliberately conducted interviews for the position of Absentee Voting Coordinator without including Defendant Woodward, despite Defendant Woodward's specific instruction that she do so.

38.   Plaintiff Perry hired Tina Gallegos to be the Absentee Voting Coordinator with the recommendation of Jaime Diaz.

39.     Plaintiff Perry's contact, lunch and subsequent hiring of Ms. Gallegos constituted preselection. Preselecting an individual for a classified position within Bernalillo County violates Bernalillo County's personnel policies.

40.     Despite Plaintiff Perry's insubordination for failing to include Defendant Woodward in the interviewing and hiring process of Ms. Gallegos, Defendant Woodward was very pleased with the hiring of Tina Gallegos because she performed well and was an excellent employee. After Plaintiff Perry's termination, Defendant Woodward promoted Ms. Gallegos and increased her rate of pay.

41.     As the Deputy over the Bureau of elections, Plaintiff Perry was charged with the responsibility of determining whether the Clerk's office needed additional voting machines for the 1994 elections.

42.     Plaintiff Perry did not adequately research the issue of whether the Bureau of Elections needed additional voting machines for the upcoming election and instead relied on the unsubstantiated suggestions of her subordinates.

43.     Without documentation or research, Plaintiff Perry informed Defendant Woodward that the Clerk's office needed an additional 300 voting machines at a cost of $1.3 million.

44.     Defendant Woodward relied on Plaintiff Perry's statements regarding the need for additional voting machines and went before the Board of County Commissioners for Bernalillo County to request that they expend $1.3 million of public money for additional voting machines.

45.     The Board of County Commissioners for Bernalillo County requested that

Defendant Woodward document and support the need for this significant

expenditure, and Defendant Woodward found that Plaintiff Perry had provided her

with no documentation or information to support Plaintiff Perry's

recommendations.

46.     The County Manager, Juan Vigil, sent Defendant Woodward a letter instructing

her to reprimand Plaintiff Perry and Jaime Diaz for their failure to adequately

research such a large request for public funds.

47.     Defendant Woodward sent a letter to both Mr. Diaz and Plaintiff Perry indicating

Defendant Woodward's disapproval of their conduct with regard to the request for

additional voting machines.

48.     Defendant Woodward was embarrassed in front of the County Commission and

the County manager due to Plaintiff Perry's flawed documentation.

49.     In January of 1994, Defendant Woodward subsequently personally reviewed the

need for additional voting machines and concluded that no additional voting

machines were needed.  No additional voting machines were purchased, and during

the 1994 election there was a surplus of 50 voting machines.

50.     In light of Plaintiff Perry's performance deficiencies as well as her poor attitude,

after the voting machine incident, in January of 1994, Defendant Woodward

realized that she must terminate Plaintiff Perry's employment due to her poor

performance and poor attitude.

51.     Defendant Woodward decided to wait until after the legislative session concluded

to terminate Plaintiff Perry for two reasons:  (1) Defendant Woodward had

legislation pending and needed to be in Santa Fe to lobby the legislators; and (2) Defendant Woodward, knowing that Plaintiff Perry's husband was very politically active, believed that if she terminated Plaintiff Perry before her legislation passed, Plaintiff Perry's husband would make sure that the legislation died.

52.     Once the legislative session ended, Defendant Woodward told Plaintiff Perry that she needed to meet with her on Saturday, February 26, 1994.

53.     Plaintiff Perry brought her husband to the meeting with Defendant Woodward. During the meeting, Defendant Woodward informed Plaintiff Perry that their relationship was no longer working.

54.     Plaintiff Perry's husband immediately told Defendant Woodward that she had to provide her with a reason for her termination.

55.     Defendant Woodward did not believe that she had to provide Plaintiff Perry with an explanation because Plaintiff Perry was a member of her personal staff and an at-will employee, and Defendant Woodward did not think that discussing all of Plaintiff Perry's deficiencies would benefit either of them.

56.     Defendant Woodward did not discriminate against Plaintiff Perry on the basis of her race.

57.     Defendant Woodward did not retaliate against Plaintiff Perry for hiring Hispanics to work in the Clerk's office.

58.     Defendant Woodward replaced Plaintiff Perry with a female Hispanic, Irene Serna.

59.     Irene Serna had previously supervised and managed various title companies and had formerly been a Deputy for a Bernalillo County Treasurer.

60. After she was promoted to the position of Deputy, Irene Serna learned the complete operations of the Bureau of Elections and was a hands-on and effective manager.

61. Defendant Woodward subsequently promoted Irene Serna to the position of Chief Deputy, and Ms. Serna remain in that position until 2000 when she left for a classified position within Bernalillo County.

62. Irene Serna was Defendant Woodward's highest paid Deputy.

63. During the time that Ms. Serna served as Defendant Woodward's Deputy, Defendant Woodward never instructed her not to hire any Hispanics.

64. During her administration, Defendant Woodward increased the number of female Hispanics in the Bernalillo County Clerk's Office by ten to fifteen percent.

65. In addition to Irene Serna and Plaintiff Perry, Defendant Woodward hired two other Hispanic women to serve as her deputies during her administration: Lena Gonzales and Priscilla Martinez.

67. Defendant Woodward hired an African American woman named Olivia Bolden to work as her personal administrative assistant. Ms. Bolden worked for Defendant Woodward in that capacity from 1996 until the end of Defendant Woodward's term in office.

68. Defendant Woodward terminated two deputies during her administration due to poor performance and poor attitude: Plaintiff Perry and Mary Jo Hooker, an Anglo.

69. Other than to comment that Plaintiff Perry was Hispanic but did not look Hispanic,

Defendant Woodward did not direct any comment to Plaintiff Perry about her race or national origin.

70. Defendant Woodward terminated Plaintiff Perry for legitimate nondiscriminatory, non-retaliatory reasons; i.e., poor performance, poor attitude, and insubordination.

## Conclusions of Law

71. The Court has jurisdiction over the parties and subject matter herein.

72. 42 U.S.C. § 1981(a) provides in part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ."

73. 42 U.S.C. § 1981(b) provides: "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

74. Section 1981 clearly prohibits discriminatory conduct that occurs both before and after the establishment of the contractual relationship. *Perry v. Woodward*, 199 F.3d 1126, 1132 (10th Cir. 1999).

75. The employment-at-will relationship encompasses sufficient contractual rights to support section 1981 claims for wrongful termination. *Id.* at 1133.

76. Only intentional discrimination may violate section 1981. *Durham v. Xerox Corp.*, 18 F.3d 836 (10th Cir. 1994).

77. A plaintiff can show intentional discrimination either by direct evidence of discrimination or by indirect evidence, employing the burden-shifting framework

*-10-*

set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

*Perry v. Woodward,* 199 F.3d at 134.

78.     Plaintiff Perry did not provide any direct evidence she was fired as a result of any

racially discriminatory reason.  *Perry v. Woodward*, 199 F.3d at 1135.

79.     The *McDonnell Douglas* analytical framework applies to claims brought pursuant

to section 1981.  *Id.*

80.     A plaintiff relying on *McDonnell Douglas* bears the initial burden of establishing a

prima facie case by a preponderance of the evidence. When the *McDonnell*

*Douglas* analysis is used, the burden of production shifts from plaintiff to

defendant and back to plaintiff.  The ultimate burden o f proving discrimination is

borne by the plaintiff.   *Id.*

81.     Plaintiff may establish a prima facie case of wrongful termination by showing that:

(1) she belongs to a protected class; (2) she was qualified for her job; (3) despite

her qualifications, she was discharged; and (4) the job was not eliminated after her

discharge.  *Id.*

82.     The burden imposed on a plaintiff at the prima facie stage is not onerous.  *EEOC*

*v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir. 2000).

83.     A plaintiff may make out a prima facie case of discrimination in a discharge case

by credible evidence that she continued to possess the objective qualifications she

held when she was hired, or by her own testimony that her work was satisfactory,

even when disputed by her employer, or by evidence that she had held her position

for a significant period of time.  *MacDonald v. Eastern Wyoming Mental Health*

-11-

*Center*, 941 F.2d 1115, 1121 (10th Cir. 1991).

84. A non-white employee who claims to have been discharged as a result of racial discrimination can establish the fourth element of her prima facie case without proving that her job was filled by a person who does not possess her protected attribute. *Id.* at 1138.

85. If the plaintiff establishes her prima facie case, a rebuttable presumption arises that the defendant unlawfully discriminated against her. *Id.* at 1135.

86. The defendant must then articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. *Id.*

87. If the defendant is able to articulate a valid reason, the plaintiff must show that defendants' articulated reason(s) was pretextual. *Perry v. Woodward*, 199 F.3d at 1135.

88. In retaliation cases, a plaintiff establishes a prima facie case by showing that: (1) she engaged in protected opposition to discrimination; (2) she was subject to adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Id.* at 1141, n. 12.

89. Plaintiff Perry made out a prima facie case of discrimination through her testimony.

90. Defendant Woodward terminated Plaintiff Perry for legitimate nondiscriminatory, non-retaliatory reasons; i.e., poor performance, poor attitude, and insubordination.

91. Plaintiff Perry failed to show that defendants' articulated reasons for her discharge were pretextual.

92. In her retaliatory claim, Plaintiff failed to show a causal connection between her

discharge and her hiring of Tina Gallegos or because she approved the transfer of Arlene Martinez into the Bureau of Elections.

93.    Under the New Mexico Human Rights Act it is an unlawful, discriminatory practice (1) for an employer to discharge or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race; and (2) for any person or employer to engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice.  N.M.Stat.Ann. § 28-1-7A & I.

94.    Defendant Woodward did not discriminate against Plaintiff Perry in violation of the New Mexico Human Rights Act.

95.    Defendant Woodward did not retaliate against Plaintiff Perry in violation of the New Mexico Human Rights Act.

96.    All Findings of Fact and Conclusions of Law not specifically adopted by the Court are denied.

97.    Plaintiff Perry is not entitled to any recovery against Defendants.  All claims by Plaintiff Perry against Defendants are hereby dismissed with prejudice.  The Court will enter a  judgment in favor of Defendants.


_____
**JOE H. GALVAN**
**UNITED MAGISTRATE JUDGE**